**PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————

Case No. 18-2755

———————

CARL SIMON,
Appellant

v.

GOVERNMENT OF THE VIRGIN ISLANDS

———————

On Appeal from the District Court
of the Virgin Islands
(District Court No.: 3-03-cv-00024)
District Judge: Honorable Wilma A. Lewis

———————

Argued on April 8, 2019

(Opinion filed: July 9, 2019)

Before: SMITH, <u>Chief Judge</u>, JORDAN and RENDELL,
<u>Circuit Judges</u>

Joseph A. DiRuzzo, III [ARGUED]
Daniel Lader
DiRuzzo & Company
401 East Las Olas Boulevard
Suite 1400
Fort Lauderdale, FL   33301

Counsel for Appellant

Su-Layne U. Walker [ARGUED]
Office of Attorney General of Virgin Islands
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI   00802

Counsel for Appellee

---

O P I N I O N

---

**RENDELL**, Circuit Judge:

Carl Simon was convicted in 1994 for his part in a break-in that led to the death of Daniel Ezekiel. Twenty-five years later, we review his petition for habeas relief. Although we agree with the Appellate Division of the District Court for the Virgin Islands that most of Simon's claims do not entitle him to relief, we remand for two reasons. *First*, the Superior Court abused its discretion when it declined to conduct an evidentiary hearing to address Simon's claim that the Virgin

Islands Government violated its *Brady* obligations by failing to disclose a prior agreement with its key witness, James Roach. *Second*, the Appellate Division erred when it dismissed Simon's claim that his trial counsel was ineffective without first remanding to the Superior Court to conduct an evidentiary hearing. Simon presented facts that, if true, tend to show his counsel had a conflict of interest by representing one of Simon's co-conspirators at the time of his trial. Thus, we will affirm in part, reverse in part, and remand to the Appellate Division with instructions to remand to the Superior Court to conduct an evidentiary hearing on those two issues.

## I.[1]

### A. The Crime and Pre-trial Events.

In September 1993, three men broke into the home of Elroy Connor. When Connor and Daniel Ezekiel returned in the midst of the break-in, a struggle ensued and Ezekiel was shot and killed. The three intruders fled the scene.

Subsequently, James Roach was arrested for his involvement in the death of Ezekiel. Roach was charged in the District Court for the Virgin Islands with first degree murder under Virgin Islands law and unlawful flight to avoid prosecution under federal law. As to the murder charge, he pled not guilty. The murder trial was prosecuted by the Virgin

---

[1] The facts of Simon's case have been thoroughly discussed in several opinions. *See* JA 30–40; *Simon v. Gov't of V.I.*, 679 F.3d 109, 111–13 (3d Cir. 2012); *Simon v. Gov't of V.I.*, 47 V.I. 3, 5–11 (2002). We thus set out here only what is necessary for the disposition of this appeal.

3

Islands Attorney General's Office. Roach testified on his own behalf, stating he was at his girlfriend's house on the night in question, and thus did not commit the crime. When asked about a possible co-conspirator, Simon, Roach stated that he did not know him. In March 1994, Roach was found guilty of first degree murder and subsequently appealed his conviction and sentence to us. He later withdrew that appeal in March 1995. Roach was also convicted on the unlawful flight charge, but in October 1994 he moved to continue sentencing on that count.

After Roach's conviction, Simon was arrested. The Government filed an Information in the Superior Court of the Virgin Islands charging him with burglary, conspiracy, and first degree premeditated murder. The Court appointed Augustin Ayala, Esq., to represent Simon.

Two weeks before trial, the Government notified Simon that it intended to amend the Information. One week before trial, it moved to amend the Information changing premeditated murder to felony-murder with a predicate felony of robbery. The amendment also added robbery and conspiracy to commit robbery. Ayala objected, as the amendment added new charges only a week before trial. The Court nonetheless granted the motion to amend the Information. Two days before trial, the Court again permitted an amendment to cure a defect over Ayala's objection, removing the conspiracy count and altering some language to reflect the elements of felony-murder.

**B. Trial and Direct Appeal**

4

At trial, the Government presented Roach as its key witness. Shortly after his conviction, Roach provided a statement to officials that was diametrically opposed to his testimony at his own trial. In the statement, he indicated that Simon orchestrated the burglary and shot Ezekiel. Roach explained his change in tune, testifying, "I was scared. I was scared for my life. That's why I didn't tell the truth then, cause Carl Simon say he going to kill me. But, I ask for protection, and I get it, so I [am] willing to tell the truth now." JA 444–45. Ayala cross examined Roach on, among other things, the "protection" he received. Ayala asked, "Do you know which Government gave the protection? Was it the Federal Government or the Local Government?" JA 482–83. He stated, "I can't—the Local." JA 483. On redirect examination, the Government asked Roach to explain what, if any promises, were made to him:

> [The Government]: Mr. Roach, will you state to the Court and the . . . Jury, whether or not the Government has made any promises to you for your testifying here today, in terms of reducing or having to do anything with your case?
> [Roach]: I ask for protection.
> [The Government]: And?
> [Roach]: So that Carl Simon and he brother [*sic*] and they couldn't get to me.
> [The Court]: Are there any other promises that were made to you by the Government?
> [Roach]: No, Sir.

JA 498. Although other witnesses testified at Simon's trial, Roach was the only witness to affirmatively place Simon at

5

Connor's house and identify him as the one who shot Ezekiel. Connor, the homeowner, testified that Roach was with a shorter man, but never identified the "short man" as Simon, nor did he identify him at trial. *See* JA 578–59 ("No, I couldn't see [his face]."). In addition, Roach and Connor's testimony conflicted: Roach indicated that Simon put a t-shirt over his head to cover his face, while Connor indicated the man wore a stocking.

The third intruder was never formally identified. Ayala questioned Roach about a man named Daryl Ward, the possible third man. Roach stated that he had a conversation with Ward in jail and that he "fit the description" of the third man, but "it wasn't him" because "he was in jail, and when I really think, it wasn't him." JA 465–66. Roach further stated that it "wasn't him" because of "how he express[ed] [him]self." JA 469. Ayala testified years later in an unrelated proceeding that:

> Ward, as far as I'm concerned, notice I said as far as I'm concerned, was part of the individuals who were in that house. The only problem that the government had, and the government didn't call him, was the Bureau of Corrections records indicated that Mr. Ward was at the Bureau of Corrections at the time. But I know that Mr. Ward was out, because I had, Mr. Ward was also one of my clients, and I remember Mr. Ward being out. And from all indications, it would appear to me that Mr. Ward was another individual who may have been there along with Mr. Simon and Mr. Roach.

JA 966. Ayala attempted to have Ward testify at Simon's trial, but "he didn't come to court. I couldn't force him to come to

6

court, because, again . . . [t]he records would indicate that he would be in jail[.]" JA 967.

Simon was found guilty of burglary, robbery, and felony-murder, and sentenced to life imprisonment without parole. He appealed the conviction to the District Court of the Virgin Islands, Appellate Division.[2] At that time, the Public Defender's Office signed an agreement with Michael Joseph, Esq. to take over Simon's appeal. Joseph filed a brief arguing that the District Court erred by permitting the Government to amend the Information to add additional charges before trial. The Appellate Division affirmed. Simon wished to appeal the decision to us. After he attempted to contact Joseph, Joseph sent a letter stating:

> I received your message . . . in which you demanded that I file a notice of appeal to the 3d Circuit from your direct appeal to the Appellate Division. . . . Unfortunately, such an appeal would be frivolous and without merit. . . . I am therefore advising you that you should seek other counsel if you insist on an appeal to the Third Circuit Court of Appeals. Note that you must file such notice immediately.

JA 921. Although Simon filed *pro se* a notice of appeal shortly thereafter, it was dismissed as untimely.

---

[2] At the time of Simon's conviction, all appeals from the Superior Court (previously known as the Territorial Court) were heard by the District Court for the Virgin Islands, Appellate Division. As discussed below, appellants were further entitled to a second appeal as of right to us.

In September 1995, the United States Attorney's Office filed a stipulation to vacate Roach's sentence of first degree murder and reduce the conviction to second degree murder. Several months after Roach testified and helped secure Simon's conviction, Roach withdrew his ongoing appeal to the Third Circuit. The United States Attorney's Office, in exchange, informed the District Court of his substantial cooperation and requested that his conviction for first degree murder be vacated and reduced to second degree murder. The Virgin Islands Assistant Attorney General who prosecuted Simon's case also submitted a letter in support of Roach's resentencing. At a hearing considering this, Roach's attorney indicated that:

> After [Roach] had filed [his] appeal with regards to this matter, we were approached by the Government and we agreed with regards to that matter to testify in the Territorial Court. Upon our testimony in the Territorial Court, we agreed and we stipulated to vacate the conviction for first degree murder.

JA 868. The District Court vacated the first degree murder sentence, and Roach pled guilty to the new count of second degree murder. The District Court subsequently sentenced him to 20 years' imprisonment.

### C. Habeas Proceedings.[3]

After Simon's direct appeal, he filed this petition in the Superior Court. Simon argued, *inter alia*, that: (1) the

---

[3] There are several habeas petitions not before us but relevant to this appeal. Immediately after his trial was completed,

Government's amendment to the Information two weeks before trial was *per se* reversible error; and (2) the Government violated its *Brady* obligations by failing to disclose a prior agreement with Roach to testify in exchange for reducing his conviction and sentence. The Superior Court denied the habeas petition in a July 18, 2002 Order without an evidentiary hearing ("*Simon I*"). Simon subsequently appealed to the Appellate Division.

While pending in the Appellate Division, Simon's attorney, believing that there were no meritorious issues to be raised on appeal, filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967). The Appellate Division, however, realized the Superior Court failed to issue a Certificate of Probable Cause ("CPC") with its order denying the petition, as required by V.I. R. App. P. 14(b). Thus, the Appellate Division remanded back to the Superior Court where it issued the CPC. The CPC stated that several issues, including the *Brady* violation and the amended Information, were worthy of review by the Appellate Division. The Appellate Division, however,

---

Simon filed *pro se* his first of several petitions. That petition was denied and Simon appealed. Arturo Watlington, Esq., was appointed as counsel for the appeal, which was later dismissed for failure to prosecute. As discussed below, Simon argues that Watlington was ineffective for failing to file an appellate brief. Simon also filed a § 2254 habeas petition with the District Court of the Virgin Islands, concurrent with the habeas petition before us. The District Court conducted an evidentiary hearing, where much of the testimony on this record was presented. The District Court dismissed that petition, however, for failure to exhaust remedies in the territorial courts.

proceeded to grant Simon's counsel's motion to withdraw pursuant to *Anders*, and deny the petition. It did so without considering the CPC. Simon then appealed to us.

We concluded that it was error for the Appellate Division to grant the petition to withdraw without considering the CPC because it established meritorious issues for appeal. *Simon v. Gov't of V.I.*, 679 F.3d 109, 115–16 (3d Cir. 2012) ("*Simon II*"). In doing so, we permitted Simon to raise additional issues on remand including several ineffective assistance of counsel claims. *Id.* at 116. On remand, the Appellate Division permitted Simon to raise, *inter alia*:

1. Whether Ayala (trial counsel) was ineffective for: (a) failing to seek a continuance when new substantive counts were added; (b) failing to object to Roach's testimony stating that Simon threatened Roach; (c) maintaining a conflict of interest by representing Ward; and (d) facilitating a breakdown in communication between Simon and himself.

2. Whether Joseph was ineffective for: (a) refusing to file the notice of appeal to us on direct appeal, when Simon had an appeal as of right; and (b) failing to raise the *Brady* violation on direct appeal.
3. Whether Arturo Watlington, Esq., was ineffective for failing to prosecute an initial (and different) habeas petition.

4. Whether the Superior Court lacked Jurisdiction to preside over Simon's trial because the crime occurred before that Court obtained jurisdiction.

10

Simon also raised the *Brady* violation and the improper amendment to the Information.

The Appellate Division denied the petition in part, dismissing all issues except whether Joseph was ineffective. JA 102–03; *Simon v. Gov't of V.I.*, 116 F. Supp. 3d 529, 575 (D. V.I. App. Div. 2015) ("*Simon III*"). For that claim, it remanded to the Superior Court to develop a factual record. After the Superior Court submitted findings of fact, the Appellate Division denied the petition, concluding that Simon had no right to counsel on his second appeal as of right to us. JA 9–28; *Simon v. Gov't of V.I.*, 2018 WL 2994374 (D. V.I. App. Div. 2018) ("*Simon IV*").

Simon again appealed to us. We now review the Appellate Division's order denying the petition in both *Simon III* and *Simon IV*.

## II.[4]

Simon raises six issues for appeal: (1) The *Brady* violation; (2) Ayala's ineffectiveness; (3) Joseph's ineffectiveness; (4) Watlington's ineffectiveness; (5) the improper amendment to the Information; and (6) the Superior Court's lack of jurisdiction. We address each argument below.

---

[4] The Appellate Division had jurisdiction pursuant to 48 U.S.C. §§ 1613a(a) and 1613a(d). We have jurisdiction pursuant to 28 U.S.C. § 1291 and 48 U.S.C. § 1613a(c).

## A. *Brady* Violation

First recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution has an obligation to disclose material evidence that could exculpate a defendant or help impeach an opposing witness. Failure to do so violates the Due Process Clause of the Fourteenth Amendment. *See Brady*, 373 U.S. at 86. To establish a *Brady* violation, the defendant must show that "(1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material." *United States v. Walker*, 657 F.3d 160, 185 (3d Cir. 2011) (internal quotation marks omitted).

Because "the prosecution . . . alone can know what is undisclosed," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), a problem arises when the defendant bears the burden to establish a violation but is unlikely to uncover evidence without assistance. To correct this imbalance, an initial showing supporting the claim of a *Brady* violation may entitle a defendant to an evidentiary hearing. The trial court should conduct a hearing where a habeas applicant "has made out a prima facie case for habeas corpus relief that is not procedurally barred[.]" *Rivera-Moreno v. Gov't of V.I.*, 61 V.I. 279, 313 (2014). If a petitioner makes a "*prima facie* showing," then the lower court may abuse its discretion if it nonetheless denies an evidentiary hearing. *Morris v. Beard*, 633 F.3d 185, 196 (3d Cir. 2011). *But see Palmer v. Hendricks*, 592 F.3d 386, 393 (3d Cir. 2010) ("[E]ven if the factual allegations in the habeas petition are sufficient to make out a *prima facie* claim for habeas relief, a district court may decline to convene an evidentiary hearing if the factual allegations are 'contravened by the existing record.'"). In considering whether to hold a

hearing, we have suggested that district courts "focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Morris*, 633 F.3d at 196.

Simon argues that the Government failed to disclose a prior agreement with Roach promising to reduce his conviction and lower his sentence in exchange for his testimony against Simon. Simon identifies several pieces of evidence that support the existence of an agreement. First, he points to testimony by Roach's attorney at the June 1996 re-sentencing hearing. Roach's attorney indicated that "[a]fter we had filed our appeal with regards to [Roach's conviction], we were approached by the Government and we agreed with regards to that matter to testify in the Territorial Court. Upon our testimony in the Territorial Court, we agreed and we stipulated to vacate the conviction for first degree murder." JA 868. Simon argues that "upon our testimony" suggests the parties reached an agreement prior to Roach's testimony, conditioned upon his cooperation. Simon also relies upon a letter from the state prosecutor recommending a downward departure for Roach's cooperation. *See* JA 866. He further argues that this is evidence of a relationship between the local and federal prosecutors, and thus the local prosecutor in Simon's case must have known about a federal agreement. *See United States v. Risha*, 445 F.3d 298, 299 (3d Cir. 2006) ("[C]ross-jurisdiction constructive knowledge can be imputed to the federal prosecution because of close involvement between the federal prosecution and state agents[.]").[5]

---

[5] Although not raised by Simon, we note that the timing of Roach's motion to continue sentencing on his federal unlawful flight charge could also support the existence of an agreement

The Superior Court denied the claim without conducting an evidentiary hearing. It concluded that Simon failed to make a showing that the Government and Roach had a *prior* agreement: "[a] request for a reduction in sentence does not, in and of itself, establish the existence of a *quid pro quo* between the United States or the Government of the Virgin Islands and James Roach." JA 131–32. The Superior Court further concluded that, even if there was an agreement "there is no reasonable probability that . . . the outcome of the trial would have been different" in light of other corroborating testimony. JA 132. The Appellate Division agreed: The evidence suggests, at most, "a two-step process" where Roach testified and then the Government reached an agreement to vacate his sentence and re-sentence him under a lesser offense. JA 43. The Appellate Division primarily relied upon our decision in *United States v. Freeman*, 763 F.3d 322 (3d Cir. 2014). In *Freeman*, we rejected the defendant's *Brady* claim that the Government failed to disclose letters between federal agents and cooperating witnesses because "there is no record evidence that the letters even existed at the time of [defendant's] trial[.]" *Id.* at 347.

At this juncture, we believe Simon has made a *prima facie* showing that a prior agreement may have existed between the Government and Roach. Roach's attorney's testimony suggests, at a minimum, that the Government initiated contact

prior to his testimony in Simon's case. Roach moved to continue sentencing in October 1994, three months prior to his testimony. The record indicates that the United States Attorney's Office later filed a § 5K1.1 motion in support of a sentence reduction on that count.

14

with Roach after he was found guilty. *See* JA 868 ("[W]e were approached by the government[.]"). Then, after that meeting, Roach dramatically changed his tune—at his own trial he claimed he did not know Simon, but at Simon's trial, he claimed that Simon orchestrated the burglary and shot Ezekiel. The Appellate Division concluded that the testimony suggests a "two-step process," JA 43, where Roach testified first and then an agreement was reached. But the testimony also supports the contrary conclusion: An agreement had been reached or assurances made before Simon's trial, in exchange for his testimony against Simon. Such a factual dispute can be resolved at an evidentiary hearing.

It is true the formal agreement between Roach and the federal Government may not have been memorialized until after trial. And favorable treatment alone is insufficient to state a *Brady* claim. *See Akrawi v. Booker*, 572 F.3d 252, 263 (6th Cir. 2009) ("[T]he mere fact that a witness desires or expects favorable treatment in return for his testimony is insufficient; there must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit *agreement*."); *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003) ("[T]he fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony."). But if the agreement was the result of prior discussions, promises, or assurances by the Government, then the fact that the agreement was put to paper later is of no moment.

Nor do we agree that even if a prior agreement existed, it is unlikely that it would have affected the trial. "Material" evidence requires only "a reasonable probability" that the outcome of the proceedings would be different. *United States*

15

*v. Bagley*, 473 U.S. 667, 682 (1985). Put simply, does the evidence "undermine confidence in the outcome"? *Id.* Here, Roach was the only witness to place Simon in the house and to claim that Simon pulled the trigger. Other testimony suggesting that Simon was on St. John at the time pales in comparison to Roach's inculpating evidence. Although Ayala attempted to vigorously cross-examine Roach on his prior false testimony, he was rebuked by Roach's claim that Simon had threatened to kill him, portraying him as desperate and dangerous. If Ayala was armed with the additional evidence that Roach reached an agreement for a lesser sentence contingent on his testimony, there is a reasonable probability the jury may have not believed Roach's claim. *See Bagley*, 473 U.S. at 676 ("[Impeachment] evidence . . . is favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." (internal citation and quotation marks omitted)). As a result, resolution of this factual dispute is necessary to determine if Simon is entitled to relief.[6]

---

[6] Simon raises the additional argument that his appellate counsel, Joseph, was ineffective for failing to raise this *Brady* claim on direct review. Such a claim is not outcome determinative. If, after an evidentiary hearing, the Court finds that there was no *Brady* violation, then Simon was not prejudiced by Joseph failing to raise the issue. *See, e.g.*, *Diggs v. Owens*, 833 F.2d 439, 446 (3d Cir. 1987) (concluding appellate counsel was not ineffective for failing to raise non-meritorious issues on appeal). And, if the Court finds that the Government did violate its *Brady* obligations, then that is grounds for habeas relief regardless of Joseph's ineffectiveness.

Our conclusion does not predetermine the merits of Simon's *Brady* claim. Rather, we conclude that the development of a factual record is necessary to determine whether the Government violated its obligation to disclose its prior promises to or agreements with a witness. It is possible the Superior Court and the Appellate Division are correct that the evidence supports only an after-the-fact agreement. But it was an abuse of discretion to make that determination absent an evidentiary hearing.[7]

### B. Ineffectiveness Assistance of Trial Counsel

The Sixth Amendment guarantees the right to effective trial counsel. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A petitioner, first, must establish "that counsel's performance was deficient." *Id.* at 687. Counsel's performance must have fallen "below an objective standard of reasonableness." *Id.* at

---

[7] This conclusion does not call into question the longstanding principle that "[w]e think it unwise to infer the existence of *Brady* material based upon speculation alone." *United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994). Here, Simon has raised a colorable claim beyond mere speculation by pointing to the testimony of Roach's attorney who specifically discussed an agreement and was ambiguous regarding the time frame of the agreement. Such ambiguity can be resolved through an evidentiary hearing.

17

688; *see also Gov't of V.I. v. Vanterpool*, 767 F.3d 157, 165 (3d Cir. 2014). Second, the petitioner must establish prejudice: a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

## 1. Ayala's Ineffectiveness

Simon argues Ayala was ineffective for several reasons. Simon first claims that Ayala failed to seek a continuance after the Superior Court granted the motion to amend the Information to add felony-murder and robbery. It is a high bar to claim ineffectiveness from failing to seek a continuance or lack of time to prepare. *Cf. Morris v. Slappy*, 461 U.S. 1, 3–4, 11–12 (1983) (appointing new counsel six days before trial when the evidence was prepared by the original attorney); *Avery v. Alabama*, 308 U.S. 444, 452 (1940) (affirming appointment of counsel three days before trial because "the examination and preparation of the case, in the time permitted by the trial judge, had been adequate for counsel to exhaust its every angle"). A short window of time to prepare is not a reason to presume ineffectiveness; counsel is ineffective only if the time frame affected the adversarial process. Here, the Government informed Ayala of the change two weeks before trial. The shift from premeditated murder to felony-murder and the addition of robbery were unlikely to meaningfully affect the trial strategy, as the differing elements are easily proved, and the evidence presented against the different charges is likely substantially similar. As a result, Ayala was not objectively unreasonable for failing to seek a continuance, nor has Simon explained how he was prejudiced.

Second, Simon argues that Ayala failed to object to Roach's testimony that Simon had threatened Roach's life and failed to object to the Government's invocation of Roach's testimony in closing argument. But Ayala's cross-examination of Roach spent significant time on whether Roach was actually afraid of Simon. He asked Roach whether "Mr. Simon was in jail" at the time he claimed to be "afraid" of him, JA 448, suggesting that this fear is exaggerated and Roach was lying. As a result, Ayala's decision to not object was reasonable in light of the alternative strategy to discredit Roach. For the same reasons, Ayala's decision to respond to the Government's closing statement, rather than object, was not an objectively unreasonable decision.

Third, Simon claims there was a constructive denial of counsel because the Court failed to substitute counsel despite an "irreparable breakdown of the attorney-client relationship." Pet. Br. at 37. He cites to Ayala's heavy caseload at the time and his repeated attempts to withdraw as counsel as evidence of the deteriorating relationship.[8] There is no evidence,

---

[8] Ayala admitted that, in light of the case load, his work was not up to his personal standards: "I would have to characterize [my performance] as ineffective, because there is no way. Capital cases require a lot of leg work. Public Defender's office[s] are not equipped with the personnel, and I mean the supporting personnel. For example, I had to do the investigations myself. I didn't have any competent investigator at that time[.]" JA 948. Although the statements of an attorney can bear on the conclusion of ineffectiveness, *Strickland* describes the standard as objective. Thus, even though Ayala may believe he was unable to be effective, we still evaluate whether his conduct was *objectively* reasonable.

19

however, that the relationship or caseload affected the reliability of the adversarial process. *See United States v. Cronic*, 466 U.S. 648, 658 (1984) ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."). The evidence instead points to Ayala being adequately prepared for the demands of Simon's trial.

## 2. Conflict of Interest

We nonetheless believe the Appellate Division erred by rejecting Simon's claim that Ayala operated under a conflict of interest without first remanding to develop the factual record. *See, e.g.*, *Rivera-Moreno*, 61 V.I. at 311–12 (2014) (concluding once petitioner makes a *prima facie* case for relief, a writ ought to be issued, and a hearing conducted).

A petitioner claiming a conflict of interest must "prove (1) multiple representation that (2) created an actual conflict of interest that (3) adversely affected the lawyer's performance." *Sullivan v. Cuyler*, 723 F.2d 1077, 1084 (3d Cir. 1983). The "critical inquiry is whether counsel actively represented conflicting interests." *Gov't of V.I. v. Zepp*, 748 F.2d 125, 135 (3d Cir. 1984) (internal quotation marks omitted). There must be a point where "the defendants' interests diverge with respect to a material factual or legal issue or to a course of action." *Sullivan*, 723 F.2d at 1086.[9] This could result from refusing to

---

[9] A petitioner need not establish an "actual" conflict of interest if the trial counsel moved to withdraw based on a conflict of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Simon urges "[we] should construe Ayala's motions [to withdraw] as objections [based on an existing conflict of interest] for

20

cross-examine a witness, failing to respond to inadmissible evidence, or failing to "diminish the jury's perception of a [co-conspirator's] guilt." *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980). A petitioner can also show that the attorney failed to pursue an alternative strategy that "(a) could benefit the instant defendant and (b) would violate the attorney's duties to the other client." *United States v. Morelli*, 169 F.3d 798, 811 (3d Cir. 1999) (emphasis omitted). Such an alternative strategy need not "have been successful if it had been used" but must have "possessed sufficient substance to be a viable alternative." *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir. 1985)).

Simon argues that Ayala had an actual conflict of interest at the time of his trial because he represented the potential third intruder, Daryl Ward. Ayala testified in an unrelated proceeding that Ward was "also one of [his] clients" and that "from all indications, it would appear" that Ward was with Simon and Roach on the night in question. JA 966. At trial, Roach testified that Ward "fit the description" of the third man, but that it wasn't him "[be]cause he was in jail, and when I really think, it wasn't him." JA 465–66. Roach further testified, however, that the three men ran from the house and that the third man parted ways "[w]here Daryl Ward lives." JA 469–70. Taken together, Simon argues that "Ayala knew that another individual was either the perpetrator of the crime that Simon was charged of, or was a potential witness to the crime." Pet. Br. at 36.

---

purposes of appellate review." Pet. Br. at 36. The record does not support that reading, and thus, Simon must establish an "actual" conflict.

The Appellate Division disagreed. It characterized Ayala's statement as "speculation" that Ward was the third man and emphasized the portion of Roach's testimony where he claimed that Ward was not the third man. JA 73. It concluded that Simon failed to establish a conflict of interest. We disagree. Ayala's statement, made under oath, cannot be properly characterized as mere speculation. Ayala stated that, based on his relationship with Ward, he believed Ward was the third man. Ayala's testimony is corroborated in part by Roach's testimony, which also implicated Ward. He claimed that Ward "fit the description" of the third man and that the third man fled towards Ward's home. JA 465. In closing argument, the Government noted that Roach indicated the third man was named Crucian; Roach also testified that he has heard people refer to Ward as "Crucian." JA 464. Finally, there was evidence that Ward was in jail at the time of the crime. But, Ayala definitively testified that Ward was out of jail at that time, even though "the [jail] records would have been against [him]." JA 967.

The evidence can be interpreted to reach two different results: one putting Ward at the scene of the crime, and one placing him in jail at the time. Based on the evidence as it exists at this time, neither interpretation can be deemed "speculation." Because Simon set out a *prima facie* claim of a conflict of interest, he was entitled to develop the factual record on this issue. We thus remand to the Appellate Division with instructions to remand to the Superior Court to develop the factual record on this claim.

## C. Joseph's Ineffectiveness: Second Appeal as of Right

22

At the time of Simon's direct review, a defendant had two appeals as of right from the Superior Court: first, to the Appellate Division of the District Court of the Virgin Islands and, then, to us. *See* 48 U.S.C. § 1613a(a) (conferring Appellate jurisdiction to the District Court over the courts of the Virgin Islands); 48 U.S.C. § 1613a(c) (conferring jurisdiction to the Third Circuit over the District Court).[10] Simon was represented by Joseph on his appeal to the Appellate Division. The Appellate Division affirmed his conviction. Then, despite Simon's desire to file an appeal to the Third Circuit, Joseph declined to do so. Simon then filed *pro se* a notice of appeal, which was dismissed as untimely. Simon argues that Joseph was ineffective for failing to file a notice of appeal to the Third Circuit—his second appeal as of right.

But a petitioner does not have a right to counsel at every stage of every proceeding. And if a petitioner does not have a right to counsel, then it is not a constitutional violation to receive ineffective assistance. *See Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982) ("Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure

---

[10] This system of two-tier appellate review as of right is rare. *See Gov't of V.I. v. Hodge*, 359 F.3d 312, 323 (3d Cir. 2004) (noting its peculiarity but recognizing Congress intended the system of review). Now, with the establishment of the Supreme Court of the Virgin Islands, criminal convictions and sentences from the Superior Court are appealed as of right to the V.I. Supreme Court, not here. Thus, this system of two-tier review (although governing at the time of Simon's appeal) is no longer in effect in the Virgin Islands.

23

to file the application timely.").[11] So Simon's claim of ineffectiveness depends on whether he had a right to counsel on his appeal to the Third Circuit. If he did, failure to file the petition was *per se* ineffective without need for a showing of prejudice. *See Solis v. United States*, 252 F.3d 289, 293–94 (3d Cir. 2001) (concluding that attorney's failure to file a notice of appeal, despite clear instructions from defendant to do so, was presumptively prejudicial). To answer this question, we must determine whether there is a right to counsel on a second appeal as of right. We conclude that there is not.

Denial of appellate counsel at important stages of appellate review may violate a defendant's rights to due process and equal protection under the law. *See Douglas v. People of State of Cal.*, 372 U.S. 353, 355 (1963); *see also* 48 U.S.C. § 1561 (Virgin Islands Revised Organic Code "Bill of Rights").

The Supreme Court has consistently addressed two concerns when considering the need for appellate counsel. First, has the appellant already received some form of appellate review? If so, a defendant would have "at the very least, a

---

[11] Simon cites *Richardson v. Superintendent Coal Township SCI*, 905 F.3d 750 (3d Cir. 2018) for the assertion that Simon had a right to counsel on the notice of appeal to the Third Circuit. There, we said "the line dividing trial from appeal falls naturally at the notice of appeal." *Id.* at 756. *Richardson* did not, however, address counsel's ineffectiveness for failing to file the notice of appeal, but rather ineffectiveness in the post-sentencing proceedings. *Id.* The Supreme Court's decision in *Wainwright v. Torna,* which addressed an attorney's failure to file a timely application for certiorari, is consistent with *Richardson* and controls here.

transcript or other record of trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case." *Ross v. Moffitt*, 417 U.S. 600, 615 (1974). And second, does the court have discretion to review? That is to say, can the reviewing court deny review "even though it believes that the decision of the Court of Appeals was incorrect[?]" *Id.* Discretionary appeals, contrary to appeals as of right, are not wholly concerned with "whether there has been a correct adjudication of guilt in every individual case[.]" *Id.* (internal quotation marks omitted). We are, thus, less concerned if a defendant does not receive the assistance of counsel on discretionary review.

Applying these principles, the Court has twice extended the right to counsel to the first tier of appellate review. In *Douglas*, it concluded that a state violates the Fourteenth Amendment if it fails to provide an indigent defendant counsel on his first appeal as of right: "[W]here the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor." *Douglas*, 372 U.S. at 357. The Court feared that having an indigent defendant "run this gantlet" without counsel results in a "meaningless ritual." *Id.* at 357–58. Similarly, in *Halbert v. Michigan*, the Court extended the right of counsel to first-tier appellate review, even though review was discretionary. 545 U.S. 605, 616–17 (2005). The Court concluded that because the reviewing court "looks to the merits of the claims" and the indigent defendant is "generally ill-equipped" to argue the merits unassisted, failure to provide counsel on such denial draws an unconstitutional line. *Id.* at 617.

The Court, however, has not recognized a right to counsel beyond the first-tier of appellate review. In *Ross*, the Court concluded that the right to counsel does not extend to subsequent discretionary appeals, since "both the opportunity to have counsel prepare an initial brief . . . and the nature of discretionary review . . . make this relative handicap far less than the handicap borne by the indigent defendant denied counsel on his initial appeal as of right in *Douglas*." *Ross*, 417 U.S. at 616. And in *Pennsylvania v. Finley*, the Court extended *Ross* to uphold Pennsylvania's decision to deny counsel on postconviction review because "[p]ostconviction relief is even further removed from the criminal trial than is discretionary direct review." 481 U.S. 551, 556–57 (1987).[12]

The second appeal as of right situates itself between the two rationales outlined by the Supreme Court. Unlike a first appeal, the defendant seeking a subsequent appeal has "at the very least, a transcript or other record of trial proceedings, a

---

[12] In *Finley*, the Court stated "[o]ur cases establish that the right to appointed counsel extends to the first appeal of right, and no further." *Finley*, 481 U.S. at 555. Other courts have relied upon this statement alone to reject a right to counsel on second appeals as of right. *See State v. Buell*, 639 N.E.2d 110, 110 (Ohio 1994) (relying on "and no further" to extend the right to counsel *only* to first appeals as of right); *State v. Hughan*, 703 N.W.2d 263, 265–66 (Neb. Ct. App. 2005) (same). But the Court has never squarely reached second appeals as of right. Because we should only apply dicta when "the case at bar is [] the situation the Court's dictum anticipated," *Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 561 (3d Cir. 2003), we decline to apply it here without further analysis.

brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case." *Ross*, 417 U.S. at 615. But, unlike discretionary review, a second appeal as of right must be reviewed, and is thus intended to ensure the "correct adjudication of guilt." *Id.*

Here, given the specific nature of the two layers of review, we conclude that deprivation of counsel on Simon's second appeal as of right to the Third Circuit does not deny equal protection or due process. After review by the Appellate Division, Simon had at his disposal the full record of the trial court, a merits brief arguing the Superior Court erred by amending the Information two weeks before trial, and an opinion addressing the merits of that claim. Any concern that he may be "ill-equipped" is significantly lessened by the thorough review on his first appeal as of right. And although review by the Court of Appeals under the Virgin Islands' scheme is also as of right, and therefore concerned with the adjudication of guilt, our review is not meaningfully different from the Appellate Division's review. *See BA Props. Inc. v. Gov't of V.I.*, 299 F.3d 207, 211–12 (3d Cir. 2002) (noting that the Appellate Division is "essentially a federal creature" where panels are comprised of "a majority of federal judges"). The same concerns present in *Douglas* and *Halbert* do not apply with equal force when the defendant lacks counsel on a second appeal as of right. Because Simon was not entitled to counsel on his second appeal as of right, any ineffectiveness does not amount to a constitutional violation.[13]

---

[13] Simon filed a legal malpractice claim based in part on Joseph's failure to file a notice of appeal to the Third Circuit. *See Simon v. Joseph*, 59 V.I. 611, 613 (2013). Whether Simon

## D. Watlington's Ineffectiveness

Simon also argues that Attorney Arturo Watlington was ineffective when he failed to file a brief in a separate habeas petition that was dismissed for failure to prosecute. We agree with the Appellate Division that we are unable to review this claim, as it involves a habeas petition distinct from the petition here.[14]

## E. The Amendment to the Information

The Government initially filed an Information charging Simon with premeditated murder and third degree burglary. Two weeks before trial, the Government notified Simon that it intended to amend the Information. One week before trial, it moved to amend the Information changing premeditated murder to felony-murder with a predicate felony of robbery. The amendment also added robbery and conspiracy to commit robbery. Ayala objected, as the amendment added new charges only a week before trial. The Court nonetheless granted the motion to amend the Information. Two days before trial, the Court again permitted an amendment to cure a defect, over

---

had a constitutional right to counsel is a separate inquiry from whether Joseph committed malpractice by failing to file the notice.

[14] Even so, because there is generally no right to counsel on habeas review, and never a right to counsel on appellate habeas review, there can be no denial of effective assistance for any alleged failure to prosecute. *See Martinez v. Ryan*, 566 U.S. 1, 16 (2012); *Torna*, 455 U.S. at 587–88 (concluding there can be no denial of effective assistance if there is no right to counsel).

28

Ayala's objection, removing the conspiracy count and altering some language to reflect the elements of felony-murder.

Simon argues that these eleventh hour amendments constituted constructive amendments, violating his Sixth Amendment right to be informed of charges against him. Simon's constitutional claim ends with the definition of a constructive amendment: "An indictment is constructively amended when, *in the absence of a formal amendment*, the evidence and jury instructions at trial modify essential terms of the charged offense[.]" *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010) (internal quotation marks omitted) (emphasis added). The amendment here was granted after a formal motion to amend. Thus, this is not a constructive amendment. Rather, the issue is whether the Superior Court abused its discretion in permitting the amendment of the Information to add a new charge of robbery, one week before trial in violation of Federal Rule of Criminal Procedure 7(e).

Rule 7(e) provides "[u]nless an additional or different offense is charged or a substantial right of the defendant is prejudiced, the court may permit an information to be amended at any time before the verdict or finding." Whether the amendment adds an "additional or different offense" is "not coextensive with the question of whether a crime is a lesser included offense of another." *Gov't of V.I. v. Bedford*, 671 F.2d 758, 765 (3d Cir. 1982). To determine if the offense is additional or different, we look to whether the original Information provides adequate notice of the added charge. *Id.* The Superior Court on habeas review concluded that the substitution of the felony murder charge for premeditated murder did not amount to the charge of a different offense, but that the trial court technically erred when it permitted the

29

Government to add the robbery charge because it is an "additional or different offense" than those offenses originally charged. We agree: A plain reading of Rule 7(e) confirms that it was an error to amend the original Information to include the robbery count. Robbery is an additional and different offense from burglary,[15] and the Information was not sufficiently detailed to alert Simon of the new offense.

Even though it was error to permit the amendment, the error was harmless.[16] *See United States v. Steiner*, 847 F.3d 103, 113 (3d Cir. 2017) ("We can call a non-constitutional error harmless, and uphold the conviction, if there is a high probability that the error did not contribute to the judgment, requiring us to have a sure conviction that the error did not prejudice the defendant.") (internal quotation marks omitted). Here, Simon received adequate notice—two weeks before the

---

[15] The offenses are different because each requires the Government to establish an element the other does not: Robbery requires the unlawful taking of personal property in the possession of another, 14 V.I.C. § 1861, and burglary requires breaking and entering into a building. 14 V.I.C. § 444(1). *See Gov't of V.I. v. Brathwaite*, 782 F.2d 399, 406–07 (3d Cir. 1986) (describing the *Blockburger* test).

[16] The Superior Court elected to impose the *Chapman* standard of harmless error review, concluding that the error was "harmless beyond a reasonable doubt." JA 122–24; *Chapman v. California*, 386 U.S. 18, 24 (1967). In doing so, it conflated a Rule 7(e) violation with a Sixth Amendment violation. As noted here, we see those as two separate inquiries, and thus reject the Sixth Amendment claim, because there was no constructive amendment or variance, and apply the lower harmless error standard to the Rule 7(e) violation.

trial—of the robbery charge and the facts significantly overlapped with the already charged offense of burglary. There is a high probability the change from burglary to robbery did not affect the trial strategy. Even so, given the record, two weeks was enough time to address any effect it may have had. Thus, to the extent that there was error, it was harmless.

## F. The Superior Court's Jurisdiction

Prior to January 1994, the Superior Court of the Virgin Islands did not have jurisdiction to hear first degree murder cases. That jurisdiction was conferred effective on January 1, 1994. The crime here occurred in September 1993 and the Government filed charges against Simon in May 1994. On appeal, Simon argues the Superior Court did not have jurisdiction over his felony-murder case because the crime occurred before the Superior Court had jurisdiction.[17] He claims the date the crime is committed is the date that determines whether a court has jurisdiction.

We disagree. The date that a court must have jurisdiction is the date that charges are filed against the defendant. *See Gov't of V.I. v. Colbourne*, 31 V.I. 22, 26 (Terr. Ct. 1994) ("[A]s long as the . . . action was filed after jurisdiction passed to the Territorial Court, the Territorial

---

[17] Simon also argues that one must look to the intent of the legislature when determining whether a statute should be applied retroactively, citing to *Brewer v. A.D. Transp. Express, Inc.*, 782 N.W. 2d 475 (Mich. 2010). Not only is *Brewer* not binding on this court, it is inapplicable, as it addresses the expansion of substantive rights in a workers' compensation context, rather than the transfer of jurisdiction between courts.

Court had jurisdiction over the matter.") (citing *Skelton v. Gov't*, T.C. Crim. No. F155/1992 (V.I. Terr. Ct. 1992), *aff'd*, 290 F. Supp. 2d 603 (D. V.I. App. Div. 1994)); *see also Old Colony Trust v. Comm'r of Internal Revenue*, 279 U.S. 716, 727–28 (1929) (having jurisdiction over a tax deficiency that occurred in 1919 and 1920, where the court gained jurisdiction in 1926 and the petition for review was perfected in 1927). Here, the Government filed the charges against Simon in the Superior Court several months after the Superior Court gained jurisdiction. Thus, the Superior Court had jurisdiction.

## III.

For the above reasons, we will affirm in part, reverse in part, and vacate the Appellate Division's order. We will remand to the Appellate Division of the District Court for the Virgin Islands with instructions to remand to the Superior Court to conduct an evidentiary hearing regarding the *Brady* violation and the conflict of interest claim.